**MISSOURI HEALTH CARE ASSOCIATION, et al.,**
**Appellants,**

v.

**Bob HOLDEN, et al., Respondents.**

No. SC 84870.

Supreme Court of Missouri,
En Banc.

Dec. 2, 2002.

Harvey M. Tettlebaum, Lowell D. Pearson, Marshall V. Wilson, Jefferson City, for Appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Charles W. Hatfield, Asst. Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for Respondents.

MICHAEL A. WOLFF, Judge.

Under the Missouri Constitution, the state cannot spend money for its operations that the state does not have. This case challenges the constitutional validity of the Governor's reduction of expenditures to nursing homes following a decrease in actual revenues.

Several nursing homes and their trade association, the Missouri Health Care Association, brought this action in Cole County circuit court. The circuit court, following a hearing, entered its findings of fact, conclusions of law and judgment upholding the reductions. This Court granted transfer prior to opinion in the court of appeals and has expedited this appeal. This Court has jurisdiction. Mo. Const. article V, section 10.

The judgment of the circuit court is affirmed.

## The Constitutional Scheme

There are several methods the constitution uses to guard against deficit spending: The Governor is required to submit a budget for each fiscal year to the General Assembly "containing the estimated available revenues of the state and all its agencies, together with his recommendations of any laws necessary to provide revenue sufficient to meet the expenditures." Mo. Const. article IV, section 24. The constitution gives the Governor the power to object to "items or portions of items" presented to him in appropriation bills with certain exceptions, Mo. Const. article IV, section 26, in addition to the power to disapprove a bill in its entirety, Mo. Const. article III, section 31. Such vetoes, of course, are subject to the power of the General Assembly to override. Mo. Const. article III, section 32.

At issue in this case is the power of the Governor, not subject to legislative override, to reduce expenditures when actual revenues are less than revenue estimates on which the budget was based. That power, conferred by Mo. Const. article IV, section 27, is expressed in these words: "The governor may control the rate at which any appropriation is expended during the period of the appropriation by allotment or other means, and may reduce the expenditures of the state or any of its agencies below their appropriations whenever the actual revenues are less than the revenue estimates upon which the appropriations were based."

Article IV, section 27, which was added to the Constitution in the 1945 revision, "freezes into the Constitution a system of executive budget control...."[1] The section "broadly authorizes the Governor to balance the state's budget in the event

1. *1943–1944 Constitutional Convention Debates*, Vol. XI at 3116–3117 (May 19, 1944)   (Remarks of Delegate McCluer, a proponent of the provision.)

that state revenues fall below the revenue expectations." *State ex rel. Sikeston R-VI School District v. Ashcroft,* 828 S.W.2d 372, 375 (Mo. banc 1992). While the constitution does not explicitly refer to a "balanced budget," it is clear from its provisions that, beyond the state's narrowly restricted capacity to borrow money, the constitution does not permit the state to spend money it does not have. *See, e.g.,* section 33.571.2.[2]

### The Appropriations for the Nursing Homes

For fiscal year 2002, which began July 1, 2001, and ended June 30, 2002, the General Assembly appropriated, with the Governor's approval, $133 million for nursing homes for one-time payments to increase quality and efficiency and for other purposes.[3] This $133 million, in HB 11 (2001) appropriated $81,196,500 in federal funds under Title XIX of the Social Security Act (the federal Medicaid program)[4] and $51,803,500 in state general revenue funds from an account known as the "intergovernmental transfer fund".

Of the total, about $5 million was allocated to purposes other than the one-time quality and efficiency grants. The remaining amount appropriated, about $128 million, was to be paid to nursing homes as one-time quality and efficiency grants in

periodic installments during fiscal year 2002, starting in July 2001.

On May 10, 2002, the Governor reduced the expenditures for one-time quality and efficiency grants by ordering that the last two payments for fiscal year 2002, totaling $20,795,140, not be made. The Governor invoked Mo. Const. article IV, section 27 as his authority for ordering the reduction.

### The Budget Process

The state's budget process, as outlined in the constitution and statutes, is complex but logical. The Governor's proposed budget, presented to the General Assembly, is based upon an estimate of revenues. Section 33.270. For the past ten years, the General Assembly, the Governor, and the office of administration have produced a "consensus revenue estimate," though they are not constitutionally required to reach a consensus. This is an estimate of the major portions of the general revenue fund expected to be available for appropriation. The "general revenue fund" is created by section 33.543, which provides: "All monies received by this state shall be deposited in the state treasury to the credit of the general revenue fund, unless required by statute or constitutional provision to be deposited in some other specifically named fund." While not specifically created by the Missouri Constitution, the existence of

---

2. All references are to RSMo 2000, unless indicated otherwise.

3. The actual appropriation, section 11.445 (HB 11, 2001) appropriated the funds to the Department of Social Services for the Division of Medical Services "for the purpose of funding one-time payments to nursing homes to increase quality and efficiency, to provide one-time funding of $2,800,000 for high Medicaid volume facilities, and to provide one-time funding of up to $1,900,000 for facilities reimbursed less than $85 per bed day."

Additionally, up to $200,000 provided within this section may be used for a comprehensive evaluation of turnover and care within the nursing home industry.
From Federal Fund ......................... $ 81,196,500
From Intergovernmental Transfer Funds ........ 51,803,500
Total (0 F.T.E.) ............................. $133,000,000

4. The Medicaid program is established in Title XIX of the Social Security Act, 42 U.S.C section 1396 *et seq.*

the "general revenue fund" is referred to in the constitution; *see, e.g.,* article IV, section 27(a) and (b) and article X, section 18(b).[5] The existence of the "general revenue fund" thus appears to be constitutionally recognized.

The largest portion of the general revenue fund is money collected by the state in taxes. Some portion of the general revenue fund consists of "intergovernmental transfers." Federal grant monies are separately accounted for as the "federal grant program fund," created by section 33.546. As the statutes indicate, there are other "funds" in the state treasury, which are not at issue here. In addition to the "general revenue fund," discussed above, the constitution creates 17 separate funds for various purposes. By statute there are special revenue funds created. *See generally,* Missouri Department of Revenue and State Treasurer, *Comprehensive Annual Financial Report* (2002). This report, required by section 32.060, contains a list, compiled by the state treasurer, of 373 separate funds or accounts maintained in the state treasury.

■ Constitutional and statutory provisions are not always consistent in their uses of the words "funds" and "accounts." In the context of the constitutional provision involved in this case, a "fund" is a creation of a constitutional or distinct statutory provision that is not part of an appropriations law. This is consistent with section 33.543, quoted above, that requires that all monies received by the state to be credited to "the general revenue fund *unless required by statute or constitutional provision to be deposited in some other specifically named fund.*" (Emphasis added.) An "account," which is part of a "fund," is a budgetary control mechanism

created administratively or in an appropriations law. Section 33.571.2, which authorizes creation of accounts, provides that "any appropriation authorizing an expenditure from the general revenue fund shall specify the appropriate account within the general revenue fund."

Money in the state treasury cannot be spent unless it is appropriated. Mo. Const. article III, section 36. The consensus revenue estimate, as noted, does not include all money expected to be available for appropriations. The consensus revenue estimate is based largely on expected net revenue from state taxes that go into the general revenue fund.

In the budget process, which begins and ends with the Governor, what is appropriated is money that is expected, not money actually in the treasury. State finances, and its budget, are a dynamic process corrections need to be made as actual revenues differ from estimates.

The parties agree that "intergovernmental transfer funds" appropriated in section 11.445 are included in the "general revenue fund." These intergovernmental transfers are monies that the state receives from local governments. The origin, however, appears to be federal money received by the state, which the state sent to nursing homes and other facilities owned by local governmental entities, which transferred the money to local governmental entities, which then transferred the money to the state. After these transfers are completed, such "intergovernmental transfer funds" are considered part of general revenue because they are monies received by the state from local governments.

**5.** The other constitutional references to the general revenue fund are: Mo. Const. article III, sections 37(a), 37(e), 37(f), 37(g), 37(h), 47; article VI, section 13; article XII, section 6.

Specific to this case, the state received the intergovernmental transfer funds from seven local governments.[6] The seven local governments own nursing homes that received "enhanced payments" under a program initiated in August 2000 and set forth in an amendment to the state's plan under the federal-state Medicaid program.[7] The state's plan is a document filed with the federal Medicaid agency, and set forth in state regulations, that describes how the various components of the state Medicaid program will be operated, including reimbursements for nursing home services. About 60 percent of the funding for Medicaid is from the federal government. When the state's plan amendment was filed with the federal agency, and not disapproved by the federal agency, it was deemed approved.

Under the plan amendment, the state made "enhanced" payments to the seven local government-owned nursing home facilities consisting of federal funds under Title XIX and "matched" with general revenue funds from the intergovernmental transfers account and another account. The government-owned nursing homes then paid the entire enhanced payments to their local government owners. These local governments, in accordance with contracts with the state department of social services, paid the entire "enhanced" amounts back to the state. The amounts were paid into the general revenue fund and credited to the intergovernmental transfers account. As such, the entirety of these first enhanced payments was back in the state treasury, and classified as general revenue funds, and thus could be used—as any other state money—as "match" for additional federal money for the Medicaid program.

Those additional federal dollars, matched by the intergovernmental transfers, are the source of money for the one-time quality and efficiency grants appropriated in section 11.445 (HB 11, 2001) for fiscal year 2002. The amounts appropriated for fiscal year 2002 for the one-time grants are referred to as "second enhanced" payments and were made available for all nursing homes—proprietary, nonprofit and governmental.

■ While the nursing homes sometimes label these "intergovernmental transfers" as a separate fund, they are more accurately described as an account in the state treasury as part of the general revenue funds created by section 33.543. The state established the intergovernmental transfer account in the general revenue fund under section 33.571.2, which provides in pertinent part: "When enacting appropriations, the general assembly, may establish such accounts within the general revenue fund as it deems necessary and appropriate to control expenditures...."

## The Nursing Homes' Fund–by–Fund Claim

The nursing homes rely on the language of Mo. Const. article IV, section 27, that is, that the Governor "may reduce the expenditures of the state or any of its agencies below their appropriations whenever the

6. The seven local government entities and the nursing facilities that they operated were: Citizens Memorial Hospital District and Citizens Memorial Health Care Facility; Madison County and Madison Medical Center; Pemiscot County and Pemiscot Memorial Hospital; Putnam County and Putnam County Memorial; Salem Memorial Hospital District and Salem Memorial District Hospital Long Term Care Center; Sullivan County and Sullivan County Memorial Hospital; and City of Excelsior Springs and Excelsior Springs Medical Center.

7. The amendment to the state plan is set forth in 13 CSR 70–10.150, effective November 2000.

actual revenues are less than the revenue estimates upon which the appropriations were based." Mo. Const. article IV, section 27.

The nursing homes contend that, in order for the Governor to invoke his power under this section, the state must show that the actual revenues to a separate fund are less than the estimates for that fund upon which the appropriations were based.

The Governor and other state defendants, on the other hand, contend that over-all decreases in expected state revenues authorize the reduction that the Governor made in these payments. They argue that the only relevant estimate of revenues for constitutional withholding purposes is the consensus estimate of general revenue and that the constitutional provision does not require fund-by-fund estimates of revenues upon which to base appropriations.

**The Over-all State Budget**

To put the parties' contentions in context, it is necessary to set forth the budget estimates, the amounts appropriated, and the actual monies available for spending. In December 2000, the consensus revenue estimate projected net general revenue for the fiscal year 2002 at approximately $6.8 billion. The Governor used this figure in submitting his fiscal year 2002 budget to the General Assembly in January 2001, a budget that recommended just over $19 billion in appropriations. The total budget includes federal money and other revenues in addition to general revenue.

That proposed budget for fiscal year 2002 included a recommendation of about $94.6 million to be appropriated from the intergovernmental transfer account in the general revenue fund. This included money for a variety of purposes, including the quality and efficiency grants at issue here. The Governor's recommendations as to the whole state budget for fiscal year 2002 were based in part on the consensus revenue estimate referred to here. There does not appear to have been a separate estimate of revenue for the intergovernmental transfers account, nor was this account part of the consensus revenue estimate.

The Governor's decision to sign HB 11 without vetoing the line, or any portion of the line, appropriating funds for nursing home quality and efficiency grants was based in part on the consensus revenue estimate that was used in submitting the Governor's budget to the General Assembly. The state's aggregate appropriations for fiscal year 2002 were based in part on that consensus revenue estimate.

After the Governor's line item vetoes, not at issue here, the entire amount appropriated for fiscal year 2002 was $19,367,000,000. The amount of that budget actually appropriated from the general revenue fund, after the Governor's line item vetoes, was $8.214 billion.[8] The amount appropriated from the intergovernmental transfer account after the Governor exercised line item vetoes was $299,360,596.

In January 2002, during fiscal year 2002, the Governor and General Assembly developed a new consensus revenue estimate for that current fiscal year of $6.419 billion, approximately $400 million less that the earlier consensus revenue estimate.[9]

---

**8.** The amount of general revenue appropriated is higher than the amount of the consensus revenue estimate because, as noted, the consensus estimate does not include all portions of general revenue.

**9.** Revenue estimates produced after the appropriations process is finished appear to have no legal significance since they are not referred to in the constitution and statutes. But the subsequent revenue estimates had practical significance because they were used

Early in fiscal year 2002, the Governor began reducing agency expenditures below appropriations. As of April 25, 2002, the Governor had withheld $536 million appropriated for fiscal year 2002. Based on a revenue estimate prepared by the office of administration, the Governor determined that additional reductions were necessary.

On May 10, 2002, the Governor announced reductions totaling $230 million, including the $20,795,140 involved here—the remaining payments for the nursing homes' one-time payments for increased quality and efficiency.

For fiscal year 2002, actual revenue to the accounts that are components of the consensus revenue estimate was $6.2 billion, approximately $640 million less than the original consensus revenue estimate and several hundred million dollars less than the revised consensus revenue estimate. The actual revenue in the intergovernmental transfer administrative account for fiscal year 2002 was $363 million, about $63 million more than the total amount appropriated from that account.

Over-all state revenue for fiscal year 2002 was $17.997 billion, about $1.7 billion less than that appropriated for fiscal year 2002.

**Triggering the Governor's Power to Reduce Spending**

What triggers the power of the Governor to reduce expenditures, under Mo. Const. article IV, section 27, is the unfortunate event when "actual revenues are less than the revenue estimates upon which the appropriations were based." In order to accept the nursing homes' theory of this case, it would be necessary to find that the intergovernmental transfer account is a separate fund, the estimate of

which was the basis for the appropriation for the nursing home payments.

■  Most saliently, the intergovernmental transfer program is not a separate fund, as recognized either in the constitution or a non-appropriations statute. The "intergovernmental transfer" designation was created as an administrative account within the general revenue fund. It has no separate statutory basis, *see section 33.543 and section 33.571.2*, discussed above. Section 33.270, which requires the Governor to submit "detailed budget estimates of revenues and expenditures for each fund," does not apply here, because the intergovernmental transfer funds are an account, not a separate fund. The same is true of section 33.290, which deals with allotment of appropriations and set-asides of reserves.

The nursing homes concede that these intergovernmental transfer funds are part of general revenue. The nursing homes contend, however, that fund-by-fund estimates are required in order to trigger the Governor's authority under article IV, section 27, to reduce spending based on revenues that are less than expected. The nursing homes argue that agencies submit forms to the Governor ("Form 9" in state budgets peak) that show resources expected to be available in various funds and accounts. Since the money in the intergovernmental transfers account was greater than expected—as determined by the amount appropriated—the nursing homes argue there is no trigger for the constitutional authority to reduce spending.

The nursing homes' argument is wrong in two related ways: first, the intergovernmental transfers account is not a separate fund but is a part of the general revenue

by the Governor to assess the extent of the revenue shortfalls by the middle of the fiscal

year.

fund, which was the subject of a revenue estimate; and second, there is no indication that the Governor or the General Assembly actually based their respective recommendation and appropriation on these forms. The state defendants point out that the sum of the Form 9 submissions was greater than the actual revenues to the general revenue fund. Moreover, part of the appropriation for the nursing homes came from Title XIX money; the Title XIX revenue, federal funds, was less than estimated.

If one accepts the nursing homes' fund-by-fund position, the Governor might well be required to estimate revenues for each of the 373 funds or accounts maintained by the state treasurer in order to determine whether his power to cut spending for any particular program is triggered by a decrease in revenues. That would read a lot more into Mo. Const. article IV, section 27 than is there. It would be most troubling to read the statute, section 33.270, which requires "detailed budget estimates ... for each fund," to include all 373 of these funds or accounts.

The record shows that the entire budget process initiated by the Governor, enacted in appropriations bills by the General Assembly, and reviewed by the Governor after passage—was based, for purposes here, on the consensus revenue estimate. The appropriations totaled $19.367 billion. The total actual revenue for that fiscal year was $17.997 billion, a shortfall of $1.37 billion.

When actual revenues are less than the revenue estimates, the constitution authorizes the Governor to reduce the amount of spending. This includes the spending of money appropriated for nursing home grants for quality and efficiency.

### The State Medicaid Regulation

When the Governor announced the reductions for this program, the department of social services attempted to suspend the state regulation, 13 CSR 70–10.150 (November 2000), which contained the state Medicaid plan amendment authorizing these grants to nursing homes.

■ The nursing homes assert that the state officials' suspension of the regulation did not comply with the procedures in sections 536.021 or 536.021. However, the constitutional authority of the Governor, under article IV, section 27, to reduce expenditures supercedes any state statute or state regulation that would purport to require the expenditure. *See Greene County v. State,* 926 S.W.2d 701 (Mo.App.1996).

### Conclusion

By various measures—over-all revenue as well as the state's general revenue fund—the state's revenues were less than anticipated. Reduction of these payments to nursing homes undoubtedly causes pain to their owners and operators and might ultimately affect the quality of care for some of the state's most vulnerable citizens. But when the state's revenues are less than expected, the constitution broadly empowers the Governor to determine how the pain of revenue shortfalls is to be distributed.[10]

The judgment of the circuit court is affirmed.

All concur.

---

**10.** There is no contention that the Governor's reductions violated any federal or state constitutional provision, other than article IV, section 27.