**JOSEPH L. POHL, CONTRACTOR, a Corporation, et al., Appellants,**

**Stephen T. Burns et al., Intervenors-Appellants,**

**v.**

**The STATE HIGHWAY COMMISSION of Missouri et al., Respondents.**

No. 53749.

Supreme Court of Missouri, En Banc.

July 8, 1968.

As Modified on Denial of Rehearing Sept. 9, 1968.

**100**

James W. Kelly, Cullen Coil, Jefferson City, for plaintiffs-appellants, Carson, Inglish, Monaco & Coil, Jefferson City, of counsel.

Robert L. Hyder, Chief Counsel, State Highway Commission, Jefferson City, Richmond C. Coburn, Sp. Counsel, Missouri Turnpike Authority, St. Louis, for respondents.

Douglas B. Remmers, Gen. Counsel, Automobile Club of Mo., Wm. W. Quigg, Goller & Hedrick, Jefferson City, for Automobile Club of Mo., amicus curiae.

SEILER, Judge.

This is an injunction suit by taxpayers who pay highway user taxes which go into the state road fund, to restrain the state highway commission and the Missouri turnpike authority from issuing revenue bonds to build a toll road or from carrying out the provisions of an agreement into which defendants have entered, particularly as regards the proposed leasing of the toll road by the highway commission from the turnpike authority at a rental to be paid by the highway commission from the state road fund sufficient to retire the obligation created by the revenue bonds, on the ground the toll road authority act, §§ 225.010–320, Laws of 1967, Senate Bill No. 2, is unconstitutional.[1] The trial court found the issues for the defendants, and plaintiffs-intervenors appeal. We reverse and remand with directions to enter judgment in favor of plaintiffs-intervenors.

The toll road authority act creates a "Missouri Turnpike Authority" and empowers it to "construct, maintain, repair, reconstruct and operate turnpike projects" at locations selected by it, § 225.060(4), and to pay the cost by turnpike revenue bonds "payable solely from tolls, revenues or other funds pledged for their payment", § 225.060(5). The act authorizes the authority to lease the toll road to the highway commission "for a consideration not less than the amount required to pay all obligations of the authority respecting the project or projects leased in conformity with the resolution authorizing or trust agreement securing the outstanding revenue bonds issued therefor by the authority * * * *", § 225.060(10). The act provides that the revenue bonds shall not constitute a debt, liability or obligation to the state or a pledge of its faith and credit, but shall be payable "solely from the revenues and other funds" pledged or provided therefor, § 225.200. The act provides that when the revenue bonds have been paid, then, at the discretion of the highway commission,

---

1. Statutory references, except where otherwise indicated, are to Revised Statutes of Missouri, 1959, and to V.A.M.S.

title to the project shall vest in the commission and the project shall thereafter be operated and maintained by the commission as a part of the state highway system; if not incorporated into the state highway system, the authority continues to operate the project as a toll road, but at a reduced toll, § 225.250. The act has numerous other provisions which need not be outlined here.

By an agreement made October 27, 1967 (the act became effective October 13, 1967), the commission and the authority have agreed that when the authority has undertaken the construction of a toll road in a location approved by the commission and determined by it to be an "essential and integral" part of the state highway system, the commission will enter into a lease with the authority, at the time of or prior to issuance of the revenue bonds, whereby the commission "shall incorporate said turnpike project into the state system of highways"[2] and "shall agree to pay from the State Road Fund a reasonable rental for the completed facility involved, which said rental shall be sufficient to retire the obligation created by the revenue bonds issued for the project by the Authority in accordance with their terms and the trust agreement relating to same, in no event to exceed a term of 40 years."

In addition to the briefs of the parties we also have before us the brief of the Automobile Club of Missouri as amicus curiae. The parties raise numerous constitutional issues. We need reach only one of these: that the act violates § 30(b), Art. IV of the 1945 Constitution by permitting an unconstitutional diversion of allocated revenue from free highways to toll roads.

■ In deciding this issue we determine first that a turnpike or toll road project authorized under the toll road authority act is not a state highway or part of the state highway system within the meaning of §§ 29, 30(a) and 30(b), Art. IV of the 1945 Constitution. Various provisions of the act make this plain. As stated earlier, the act expressly provides that a toll road project does not become a part of the state highway system until it is paid for, and then only if the highway commission, in its discretion, elects to take it. It is only thereafter that it may be operated and maintained by the highway commission as part of the state highway system. If it is not incorporated into the state highway system, it continues its character as a toll road, operated by the toll road authority, but at reduced tolls, sufficient to cover maintenance and repair, § 225.250.

■ Sec. 225.130 authorizes the authority to contract with any corporation for the placing of utility lines in the right-of-way of the project and to charge rentals therefor. If the toll road project were part of the state highway system, a rental charge could not be exacted from a public utility for such use of right-of-way under the present statute, § 227.240; State ex rel. State Highway Commission v. Weinstein (Mo.Sup. banc) 322 S.W.2d 778; State ex inf. McKittrick v. Southwestern Bell Telephone Company, banc, 338 Mo. 617, 92 S.W. 2d 612; State ex rel. State Highway Commission v. Union Electric Company of Missouri (Mo.App.) 142 S.W.2d 1099, 1102, and State ex rel. State Highway Commission v. Kansas City Power & Light Co., 232 Mo. App. 308, 105 S.W.2d 1085.

Other powers granted the authority demonstrate further the legislature did not regard the toll roads as part of the state highway system. Under § 29, Art. IV, 1945 Constitution, the highway commission has exclusive authority over the location, construction, and maintenance of all state highways and power of limitation of access to such highways. Yet by §§ 225.060(4)

---

**2.** The defendants are thus ignoring the provisions of the act, supra, that only after the bonds have been paid in full can the highway commission operate and maintain the project as a part of the state highway system. However, we need not concern ourselves with this inconsistency in view of our opinion that the act is unconstitutional.

## 102

and 225.060(8), the toll road authority is empowered to fix the location of the project and to construct and maintain the same, and to locate, establish and limit access and egress from rights-of-way to the toll road, which the legislature, mindful of its mandate to comply with the constitutional provisions, could lawfully authorize to be done only if it intended that a turnpike or toll road not be considered a part of the state highway system. In addition the legislature made it clear, by § 225.250, that a turnpike or toll road project was not to be a part of the state highway system until it was fully paid for. All in all, there is nothing in the act indicating that the legislature intended to designate a toll road as part of the state highway system.

Further on this point, we note the defendants in their brief in discussing the power given the toll road authority argue that it does not extend to state highways, but to "the creation of new toll roads not a part of the State Highway System". Defendants also, in the agreement of October 27, 1967, speak in terms of "taking the completed highway or highways into the State Highway System" and dealing with projects which are "to be considered for incorporation in the State Highway System." It is evident the defendants, too, do not regard the toll roads as part of the state highway system.

Now, what does the toll road authority act provide with respect to payment of the toll road bonds, in the event the parties make a lease of the toll road project to the highway commission, which the agreement of October 27, 1967 makes clear is what the parties intend to do? By § 225.060(10), as plaintiffs-intervenors point out, the legislature has solemnly authorized the highway commission to agree to pay to the toll road authority a rental for the project

of a sum "not less than the amount required to pay all obligations of the authority respecting the project or projects leased." This would include the obligation to retire the bonds issued by the authority. Sec. 225.-060(10) also authorizes the authority to authorize the commission, if it leases the toll road, to fix and collect the tolls and other charges for the use of the project. The commission is authorized to use the funds thus collected for the purposes specified in the lease, one of which presumably would be to pay off the principal and interest on the revenue bonds as they come due. But suppose the tolls are not sufficient? Then to comply with the legislatively authorized agreement to pay not less than the amount required to pay all obligations of the authority respecting the project, the commission would have to resort to other funds available to it.

The only other funds available to the state highway commission are the funds it receives under § 30(b), Art. IV, 1945 Constitution, whereby, "For the purpose of constructing and maintaining an adequate system of connected state highways" all state revenue from highway users, including state license fees and motor vehicle fuel taxes, less certain administrative expenses, are to be "credited to a special fund and stand appropriated without legislative action for the following purposes, and no other." Then follow provisions for the payment of principal and interest on any outstanding road bonds with directions that any balance shall be credited to the state road fund and expended by the state highway commission for five expressly set out purposes, none of which include toll roads, but which, instead, relate to state highways, bridges and tunnels and the state system of highways.[3]

There is no escape from the conclusion that in authorizing the highway commission

3. That the highway user taxes make up over 95% of the receipts of the highway commission (aside from federal aid refunds) can be seen by examination of the official annual reports in recent years of the highway commission to the governor, § 226.140, and of the director of revenue to the governor and members of the General Assembly, § 32.060. Federal funds are not available to pay rentals on toll roads, Title 23, § 301, U.S.C.A.

to agree to pay a rental sufficient to meet all obligations of the authority, the legislature has sought to be made available through the highway commission, to the extent that the tolls prove insufficient, recourse to the state road fund to pay the obligations incurred by the authority. Even § 225.200, the section which states that the bonds are not to constitute a debt, liability or obligation of the state or a pledge of its faith and credit, does not state the bonds shall be payable solely from toll revenues, but states they shall be payable "solely from the revenues and other funds provided therefor." In four other places, the act refers to "other funds" in addition to tolls, fees, and revenues. Nowhere does the act state that the bonds shall be payable solely from toll revenues. Under § 225.250, subd. 1, even if the highway commission waits until the revenue bonds have been fully paid before the commission elects to operate and maintain the project as part of the state highway system, the highway commission may continue to operate it as a toll road until the commission recovers "a sum equal to *any commission funds * * * used to pay all or a part of the bonded indebtedness on the project"* (emphasis supplied). Note that there is no limitation on how much or which of the commission funds may be so used. In their brief, defendants state flatly that the bonds are supported "by a pledge of the tolls and the State Road Fund." A purchaser of such a toll road bond, supported by a lease of the project to the highway commission for an amount not less than the amount required to pay all obligations of the authority respecting the project (which, as pointed out, the legislature has authorized the highway commission to agree to), could and would expect the highway commission to make up the difference if the tolls should prove insufficient to pay the installments and interest on the outstanding bonds. There is no way of telling how much of a drain this might be on the state road fund. It is readily conceivable that it might be enough of a diversion so that the highway commission would be seriously handicapped in carrying on the necessary construction and maintenance of the free public state highway system.[4]

Defendants contend the state road fund is a constitutionally created fund derived from excise taxes on motor vehicles and fuels, and that the highway commission is authorized to use the fund in support of toll roads, citing State ex rel. Kansas City v. State Highway Commission, banc, 349 Mo. 865, 163 S.W.2d 948, and State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 74 S.W.2d 367. Defendants say that the Kansas City case establishes the proposition it is lawful for the highway commission to use state road funds to pay for maintenance of the lower deck structure of the ASB bridge in Kansas City, being the portion devoted entirely to railroad tracks owned by a private company, and if this is lawful, it follows, they say, that proposed expenditures from the state road fund to meet the obligations assumed by the highway commission under the proposed lease of the toll road would also be lawful. The issue before the court in the Kansas City case was whether mandamus should issue to compel the highway commission to reimburse the city and the county for the cost of the

---

4. The record does not contain any evidence as to the probable cost per mile of a turnpike or toll road project at today's prices for labor, material, equipment and right-of-way. However, the report filed by the Joint Turnpike Committee of the Sixty-Seventh Session of the General Assembly, published in 1953, speaks of costs in those days of over $1,000,000 per mile. Obviously costs would be substantially higher today and there could be a heavy potential liability hanging over the state road fund.

Sec. 227.210 provides that the state highways designated in § 227.020, those acquired by condemnation or gift or from political subdivisions by reimbursement as provided in §§ 227.120–150, and those donated by political subdivisions pursuant to § 227.170 "shall be maintained by the commission and kept in a good state of repair *at whatever cost may be required*" and that "The cost of repairing and maintaining said roads *shall be paid out of the state road fund * * *"* (emphasis supplied). .

bridge, which had been acquired by the commission, 163 S.W.2d l.c. 952. The commission was arguing the statute requiring reimbursement was unconstitutional because it imposed new obligations upon the constitutional state road fund. But the court held, 163 S.W.2d l.c. 952, "The constitutional provision created the fund and specifies the purposes for which it is to be used", referring to § 44a, Art. IV of the 1875 Constitution, amendment adopted November 6, 1928, which stated the purposes for which the proceeds of the state bond issue were to be used. One of the stated purposes was to reimburse political subdivisions for money spent by them in acquisition of bridges taken over by the state as part of the state highway system.

On motion for rehearing in the Kansas City case, the court said that while the commission agreed to maintain the entire structure, which would include the railroad deck, this was only incidental to maintenance of the bridge itself and one of its integral parts, and pointed out that with respect to the railroad track, the bridge company agreed to maintain this without expense to the commission. The Kansas City case is in no wise authority for the proposition that the constitutional state road fund can be diverted by the commission to pay for a toll road.

Defendants cite the City of Hannibal case as support for the proposition that the highway commission can use money from the state road fund to help pay for the construction of a city toll bridge, ergo, the same can be done with respect to a toll road. The contentions raised by the state auditor, who refused to register the revenue bonds issued by the city and against whom mandamus was sought, were that the statute authorizing the contribution by the highway commission was unconstitutional under the 1875 Constitution by reason of § 45, Art. IV, which prohibited giving or lending of credit to a municipal corporation, § 46, Art. IV, which prohibited granting of public money to a municipal corporation, and for the further reason that the

statute authorizing the highway commission to make such a contribution constituted a special or local law. The court held it was not a case of state funds being contributed to a project to be owned exclusively by a municipal corporation; that it really was a case where the city was contributing to the state highway system and analogous to the situation where the highway commission builds streets in municipalities that form a part of the state highway system. The court held that the contribution by the state highway commission toward the construction of the bridge was not the granting of public money to the city and that the statute did not constitute a special or local law.

The City of Hannibal case has been cited many times but never, so far as we can ascertain, in support of the proposition for which it is now cited by the defendants. In fact, the matter of whether the contribution by the highway commission toward the construction of the bridge was an improper diversion of the state road fund for the reason it was required to be used exclusively for free public highways (which would be similar to the point before us in the case at bar) was not actually raised in the Hannibal case. As pointed out above, the objections raised were that the contribution amounted to the giving of credit to a municipal corporation, that it constituted a grant of public money to a municipal corporation, and that the act authorizing the contribution was invalid as a special or local law.

The City of Hannibal decision was handed down in 1934. At that time § 44a, Art. IV of the 1875 Constitution, as amended November 6, 1928, after providing for the payment of the principal and interest of the state road bonds, provided that the highway user taxes were to stand appropriated without legislative action to the state road fund to be used by the highway commission "for the purposes and in the manner hereinbefore set forth". It is to be noted that the 1945 Constitution in § 30, Art. IV and the amendment thereto, adopted March 6, 1962, § 30(a) and § 30(b)

of Art. IV, are more emphatic and restrictive in what can be done with the revenue from the highway user taxes. Both state that all such revenue "shall be credited to a special fund and stand appropriated without legislative action *for the following purposes, and no other*" (emphasis supplied). The people thereby emphasized their determination that the highway user taxes could be used only for the purposes listed in the Constitution and, as we have previously held, toll roads are not included. We do not consider that the City of Hannibal case holds otherwise.

■ Defendants make reference to subsection (5), the final subsection of § 30(b) of Art. IV, dealing with the purposes for which the state road fund may be used, which provides "For such other purposes and contingencies relating and appertaining to the construction and maintenance of such highways and bridges as the commission may deem necessary and proper", as authorizing use of the fund for toll road purposes. However, this subsection must be considered along with what immediately precedes it in subsections (1) through (4) of § 30(b). When so read and considered, it is plain that any authority or power conferred by subsection (5) is clearly limited to the accomplishing of additional discretionary matters in connection with the highways and bridges specified in subsections (1) through (4), which do not include toll roads. Otherwise the words "of such highways and bridges" would be meaningless. The adjective "such", as has been well said in 83 C.J.S. Such, p. 771, "In its natural and ordinary sense, and by grammatical usage * * * refers to an antecedent, some antecedent word or phrase * * * Thus the word 'such' refers back to and identifies something previously spoken of, something that has gone before, something that has been specified. It always refers to a class just before pointed out, and should be construed as referring back to a common subject matter * * *" According to Webster's Third New International Dictionary, among the senses in which "such" is used are "previously characterized or specified" and "of the same class, type, or sort: in the same category: similar", which are applicable here. In State ex rel. King v. Board of Trustees, 192 Mo.App. 583, 184 S.W. 929, 932, the court said, "* * * the word 'such' is essentially a term of comparison. It means 'of that kind; of the same or like kind; identical with or similar to something specified' * * *" In City of St. Louis v. Terminal R. Assn., 211 Mo. 364, 109 S.W. 641, 644, the court, in construing a sentence in the city charter which read "Every ordinance requiring such work to be done shall contain a specific appropriation," etc., said, " 'Such work' means work of the character mentioned in the preceding section of that article * * *" We accordingly overrule this contention of defendants.

Certainly prior legislatures have regarded the highway user taxes as being exclusively for use on the free public highways. The motor vehicle fuel tax law, § 142.020, states that its purpose is "to provide funds for the construction and maintenance of the public highways of this state", which it defines, § 142.010(9), as "every way or place of whatever nature, generally open to the use of the public as a matter of right, for the purposes of vehicular travel * * *"

The original 2 cents per gallon gasoline tax, as adopted by initiative November 4, 1924, provided it was for the purpose of completing "the construction of and for the maintenance of the State Highway System of this state", Laws of Missouri, 1925, p. 282. The amendment of 1937, H.B. No. 1, raising the tax to 3 cents per gallon contained the same statement of purposes, Laws of Missouri, 1937, p. 379. The 3 cents per gallon tax was repealed by referendum November 8, 1938. The definition of "public highways" quoted in the preceding paragraph first appeared in the 1943 amendment, S.B. No. 68 and H.B. No. 676, Laws of Missouri, 1943, pp. 657 and 670, respectively, and at the same time the purposes statement was changed by changing the language about completing the construction of

the highway program to that of providing "for the construction and maintenance of public highways of the state". In 1949 the tax was raised to 4 cents per gallon, Laws of Missouri, 1949, p. 331. The purposes were unchanged. The 4 cent tax was repealed by referendum April 4, 1950.

In 1961 the tax was raised to 5 cents per gallon and again the purposes were stated to be for the construction and maintenance of the public highways of the state, Laws 1961, p. 609. The act provided further that unless the people adopted the proposed amendment of Article IV of the constitution authorizing 1 cent of the 5 cents to be apportioned among the cities and counties of the state, the tax would revert to 3 cents per gallon. It thus took a constitutional amendment to authorize a sharing of the gasoline tax with cities and counties. Yet the toll road act purports to authorize, by statute, a sharing with the toll road project. This it cannot constitutionally do.

The legislature likewise has always made it clear that no payments shall be made from the state road fund except for the purposes set out in subparagraphs (1)–(5) of § 30(b), Art. IV of the constitution, see § 226.220, subd. 3 and prior acts, providing that "No payments or transfers shall ever be made from the state road fund except for an expenditure made * * * [f]or a purpose set out in subparagraphs (1), (2), (3), (4), or (5) of section 30, article IV, of the constitution."

Commencing with the Centennial Road Law in 1921 when the legislature embarked on the program of getting Missouri out of the mud, and continuing through the constitutional amendment of November 6, 1928, which added a new § 44a to Art. IV of the 1875 Constitution and authorized an additional $75,000,000 in state road bonds, the adoption of the Constitution of 1945, and the amendment to § 30 of Art. IV adopted March 6, 1962, the state highway system in

Missouri has been a system of free highways and the revenues authorized by § 30(b) of Art. IV of the present Missouri Constitution are allocated for the construction and maintenance of free public highways and cannot be diverted, or made subject to diversion if needed, for the payment of a toll road in whole or in part. It is not necessary to show that such diversion definitely would result (although it is apparent the defendants, by their agreement, anticipate the state road fund will be used). The fact is that § 225.060(10) would authorize, permit and encourage such diversion and this is sufficient to make the provision unconstitutional.

■ For the foregoing reasons, therefore, that portion of the act which permits resort to the state road fund to meet the obligations of the authority is unconstitutional as in violation of § 30(b), Art. IV of the 1945 Constitution. It is apparent, we believe, that the other provisions of the act are "so essentially and inseparably connected with, and so dependent upon" that part of the act authorizing the highway commission to lease the project at a rental not less than the amount required to pay off the bonds which, together with the numerous references in the act to the availability of "other funds", constitutes an attempted authorization to the highway commission to use the state road fund for rental payments if the tolls prove insufficient, that we cannot presume the legislature would have enacted the other parts of the act without the portion we have ruled unconstitutional, § 1.140. Without the unconstitutional portion, the authority would have to proceed unsupported by the presumed right of the highway commission to use the state road fund to pay the obligations of the authority and the bonds. Had that been the intention the proposed lease arrangement and resort to the state road fund need not have been included in the act.[5] We are fur-

5. Earlier toll road bills, none of which contained the lease arrangement or the provisions of the present act permitting resort to the state road fund, were not adopted by the General Assembly, S.B. No. 38 and H.B. No. 399, Sixty-Seventh General Assembly, and H.B. No. 423, Seventy-Second General Assembly.

ther of the opinion that the rental portion of the act, in effect an attempt to underwrite the project by promising recourse to the state road fund, is so inextricably woven into the successful issuance and sale of the turnpike revenue bonds by which the money is to be raised to pay for the project, that without it the act as written is unworkable. For these reasons we hold the entire act unconstitutional.

The judgment is therefore reversed and the cause remanded with direction to the trial court to enter a permanent injunction against the defendants as prayed for by plaintiffs-intervenors.

All concur.