# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-2857

_____

Shondel Church; Randall Lee Dalton; Dorian Samuels; Viola Bowman; Brian Richman

*Plaintiffs - Appellees*

v.

State of Missouri; Michael L. Parson,[1] in his official capacity as Governor of the State of Missouri

*Defendants - Appellants*

Michael Barrett; H. Riley Bock; Charles R. Jackson; Craig Chval; A. Crista Hogan

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 10, 2018
Filed: January 10, 2019

_____

Before GRUENDER, MELLOY, and BENTON, Circuit Judges.

_____

[1]While this appeal was pending, Eric R. Greitens resigned as governor of Missouri. His successor, Michael L. Parson, is automatically substituted under Federal Rule of Appellate Procedure 43(c)(2). *See **Digital Recognition Network, Inc. v. Hutchinson***, 803 F.3d 952, 952 n.1 (8th Cir. 2015).

BENTON, Circuit Judge.

This is a class action against the State and governor of Missouri, the director of the Missouri State Public Defender office, and the commissioners of the Missouri State Public Defender Commission. The plaintiffs alleged that the State "has failed to meet its constitutional obligation to provide indigent defendants with meaningful representation." Invoking sovereign immunity, the State and governor moved to dismiss. The governor also invoked legislative immunity. The district court denied the motion. *Church v. Missouri*, 268 F. Supp. 3d 992 (W.D. Mo. 2017). The director and commissioners do not appeal. Having jurisdiction under 28 U.S.C. § 1291 through the collateral order doctrine,[2] this court reverses and remands.

I.

The Sixth Amendment guarantees indigent defendants in criminal cases the right to appointed counsel. *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963). Because the right to counsel is "fundamental and essential to a fair trial," it is "protected against state invasion by the Due Process Clause of the Fourteenth Amendment." *Id.* at 341-42.

The State usually provides counsel through the Missouri State Public Defender. *See State ex rel. Missouri Pub. Def. Comm'n v. Pratte*, 298 S.W.3d 870, 875 (Mo. banc 2009) (indigent defense is "a duty which constitutionally is the burden of the State," and "[w]hen a defendant is found to be indigent in Missouri, the defendant's Sixth Amendment right to counsel is usually met by the judge appointing the 'Office of State Public Defender'") (citation omitted). Here, the plaintiffs "were all charged

[2] *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993); *Fryberger v. University of Ark.*, 889 F.3d 471, 473 (8th Cir. 2018); *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1048 (7th Cir. 2013); *Scott v. Taylor*, 405 F.3d 1251, 1253 (11th Cir. 2005).

-2-

with crimes in Missouri state court and, as a result of their indigency, were entitled to representation by the MSPD." They bring this lawsuit "on behalf of themselves and a putative class of all indigent defendants in criminal and juvenile proceedings in Missouri who are eligible for representation by the MSPD." The putative class does not include individuals seeking post-conviction relief. *See Mo. Sup. Ct. R. 24.035(e), 29.15(e)* (requiring appointment of counsel for all pro se, indigent, post-conviction movants).

The plaintiffs allege: "The State's indigent defense budget is shockingly inadequate. . . . Without sufficient funding, overstretched and under-resourced [MSPD] attorneys are forced to handle far too many cases and to devote far too few hours to each case." They argue they "have suffered and continue to suffer the denial of adequate counsel at critical stages of their criminal cases due to these systemic caseload problems among MSPD attorney." They seek "a declaratory judgment stating that their right to counsel is being violated and an order enjoining the ongoing violation of their rights and requiring Defendants to propose a remedial plan to the court."

II.

The State of Missouri invokes sovereign immunity for itself. "This court reviews de novo questions of sovereign immunity." *Fryberger*, 889 F.3d at 473. "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). The Eleventh Amendment is "one particular exemplification of that immunity." *Federal Mar. Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 753 (2002). The State removed this case to federal court, waiving its Eleventh Amendment immunity. *See Lapides v. Board of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002) ("We conclude that the State's action joining the removing of this case to federal court waived its Eleventh Amendment immunity").

-3-

But "[s]tates also enjoy a broader sovereign immunity, which applies against *all* private suits, whether in state or federal court." *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015), *citing Alden v. Maine*, 527 U.S. 706, 713 (1999) ("We have . . . sometimes referred to the States' immunity from suit as 'Eleventh Amendment immunity.' The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment."). The Supreme Court "has repeatedly held that the sovereign immunity enjoyed by the States extends beyond the literal text of the Eleventh Amendment." *Fed. Mar. Comm'n*, 535 U.S. at 754.

"The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Id.* at 760. Developed at common law, "immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." *Alden*, 527 U.S. at 713. *See also Nevada v. Hall*, 440 U.S. 410, 414-16 (1979) (explaining sovereign immunity's common-law origins). "States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." *Stewart*, 563 U.S. at 253. "The leading advocates of the Constitution assured the people in no uncertain terms that the Constitution would not strip the States of sovereign immunity." *Alden*, 527 U.S. at 716. "The founding generation thought it 'neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons.'" *Id.* at 748, *quoting In re Ayers*, 123 U.S. 443, 505 (1887).

"[N]either logic nor precedent supports the proposition that a state waives its general state sovereign immunity by removing an action from state court to federal court." *Beaulieu*, 807 F.3d at 486. Missouri's state sovereign immunity applies unless "it is waived or a statutory or recognized common law exception, such as

-4-

consent, is applicable." ***Metropolitan St. Louis Sewer Dist. v. City of Bellefontaine Neighbors***, 476 S.W.3d 913, 914 (Mo. banc 2016). The plaintiffs assert both a waiver and a common-law exception, contending that sovereign immunity does not apply in Missouri when a plaintiff seeks prospective equitable relief to enforce the State's affirmative duty or obligation.

A.

Courts "give effect" to a state's waiver of sovereign immunity "only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" ***Port Auth. Trans-Hudson Corp. v. Feeney***, 495 U.S. 299, 305 (1990), *quoting **Atascadero State Hosp. v. Scanlon***, 473 U.S. 234, 239-40 (1985). Express language does appear in section 537.600, RSMo 2016, which "carve[s] out limited exceptions [for negligent operation of motor vehicles and dangerous conditions of public property] to a general rule of immunity." ***Bellefontaine***, 476 S.W.3d at 921.

Emphasizing two Missouri Court of Appeals opinions, the plaintiffs argue that sovereign immunity does not bar a claim for equitable relief to enforce the State's affirmative "duty or obligation." In *Wyman v. Missouri Department of Mental Health*, 376 S.W.3d 16, 23 (Mo. App. 2012), the court of appeals said it "found no case which applies § 537.600 to a claim seeking only equitable relief." The Court of Appeals then stated that "sovereign immunity does not necessarily bar a claim for injunctive relief which seeks to reverse a state agency's prior violation of its statutory obligations, or to prevent future violations." ***Wyman***, 376 S.W.3d at 23. In 2018, the Court of Appeals–citing the district court's decision here–quoted and followed *Wyman*. ***Missouri State Conf. of NAACP v. State***, 2018 WL 5492832, at *6 (Mo. App. Oct. 30, 2018)**.**

Both the *Wyman* and *NAACP* opinions fail to address the abundant contrary Missouri authority on sovereign immunity. In 2016 and 2017, the Supreme Court of Missouri stated: "Sovereign immunity is the rule, not the exception." ***Bellefontaine***, 476 S.W.3d at 914; ***Newsome v. Kansas City Mo. Sch. Dist.***, 520 S.W.3d 769, 775 (Mo. banc 2017). Of critical importance here, the Missouri Supreme Court held that

> in the absence of an express statutory exception to sovereign immunity, or a recognized common law exception such as the proprietary function and consent exceptions, sovereign immunity is the rule and applies *to all suits* against public entities.

***Bellefontaine***, 476 S.W.3d at 921-22 (emphasis added). Because—except for statutory and common-law exceptions—sovereign immunity bars *all* suits against the State, it bars suits for prospective equitable relief.

The plaintiffs claim that *Bellefontaine* covers only suits for damages because that is all the plaintiff there sought. To the contrary, *Bellefontaine* follows the long-established Missouri precedent on sovereign immunity. Granting injunctive relief against an unconstitutional law in 1908, the Missouri Supreme Court held:

> That the sovereign state may not be sued is a truism . . . . But defendants . . . . ministerial officers, charged to be about to do irreparable injury . . . . are not beyond the strong arm of a court of equity.

***Merchants' Exchange of St. Louis v. Knott***, 111 S.W. 565, 574 (Mo. banc 1908) (agreeing with the *Ex parte Young* doctrine for state injunction cases just two months after the United States Supreme Court's decision). The Missouri Supreme Court has repeatedly followed this approach.

> The amenability of respondents as executive or administrative officers of the State to the restrictive power of the courts in a proceeding of this character has been frequently declared in a number of cases . . . . It is not

> to be understood from these cases that the state itself can be enjoined; but, when its officers act in an unconstitutional or illegal manner they are not to be regarded as acting for the state, and they may be enjoined.

*Carson v. Sullivan*, 223 S.W. 571, 571 (Mo. banc 1920) (citing several cases including *Merchants' Exchange* and *Ex parte Young*). *See*, *e.g.*, *Nacy v. Le Page*, 111 S.W.2d 25, 25–26 (Mo. banc 1937) ("because the state may not be sued without its consent" and because a garnishment "seeks to compel action on the part of the state," a state court may not require the State to submit to a legal writ of garnishment) (changed by § 525.310, RSMo 1943); *State ex rel. Eagleton v. Hall*, 389 S.W.2d 798, 801 (Mo. banc 1965) (a will-contest suit affecting residuary estate left to state is a suit against the state, thus barred by sovereign immunity) , *quoted in* *Bellefontaine*, 476 S.W.3d at 921; *Garland v. Ruhl*, 455 S.W.3d 442, 446 (Mo. banc 2015) (even when a statute authorizes award of attorney fees against the state, sovereign immunity prevents ordering the state to do so, due to strict construction of the statute).

Because the two Court of Appeals opinions have a limited consideration of controlling Missouri Supreme Court cases and fail even to address contrary authority, the *Wyman* and *NAACP* cases are not instructive as to how the Missouri Supreme Court would decide the sovereign immunity issue in this case. *See United Fire & Cas. Co. v. Titan Contractors Serv., Inc.*, 751 F.3d 880, 885 n.2 (8th Cir. 2014).

The plaintiffs cite five cases where the Missouri Supreme Court affirmed injunctions directed at the State. *See Weinschenk v. State*, 203 S.W.3d 201, 205 (Mo. banc 2006); *Brooks v. State*, 128 S.W.3d 844, 851 (Mo. banc 2004); *Rolla 31 Sch. Dist. v. State*, 837 S.W.2d 1, 7 (Mo. banc 1992); *Pohl v. State Highway Comm'n*, 431 S.W.2d 99, 107 (Mo. banc 1968); *Koplar v. State Tax Comm'n*, 321 S.W.2d 686, 697 (Mo. 1959). These five cases, plaintiffs assert, show it is "perfectly ordinary" to enjoin the State itself to force compliance with its obligations.

First, in the three most recent cases, state officials–subject to Missouri's *Ex parte Young* doctrine–were also named as defendants. *Weinschenk*, 203 S.W.3d at 204 n.1 (secretary of state); *Brooks*, 128 S.W.3d at 846 (attorney general); *Rolla*, 837 S.W.2d at 2 & n. 2 (naming the "various state officials" who were defendants). The *Pohl* case is an "injunction suit by taxpayers." *Pohl*, 431 S.W.2d at 100. *See Manzara v. State*, 343 S.W.3d 656, 658-59 (Mo. banc 2011) (reviewing history of taxpayer suits since 1873 and holding "when a public interest is involved and public monies are being expended for an illegal purpose, taxpayers have the right to enjoin the action" so "government officials conform to the dictates of the law"). The *Koplar* case is a judicial review of administrative decisions under the Missouri Administrative Procedure Act–specifically held to be a "waiver of sovereign immunity." *See St. Louis County v. State*, 424 S.W.3d 450, 454 n.3 (Mo. banc 2014) (statute authorizing judicial review of administrative decisions is a waiver of sovereign immunity). As a result, none of these five cases even hint at the threshold question presented here: whether Missouri's sovereign immunity covers suits for prospective equitable relief. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). *See also Byrne & Jones Enters., Inc. v. Monroe City R-1 Sch. Dist.*, 493 S.W.3d 847, 855 (Mo. banc 2016) ("Judicial decisions must be construed with reference to the facts and issues of the particular case, and that the authority of the decision as a precedent is limited to those points of law which are raised by the record, considered by the court, and necessary to a decision.") (citation omitted).

Second, adopting the plaintiffs' view creates a judicial exception to sovereign immunity. But *Bellefontaine* rejects that, explaining it would "not judicially create an exception to the common law rule of sovereign immunity" to address the specific situation there because the issue presented "policy concerns . . . for the legislature." *Bellefontaine*, 476 S.W.3d at 923. The legislature—not the judiciary—must waive sovereign immunity. *Id.* at 921 ("This Court cannot read into the statute an exception

to sovereign immunity or imply waivers not explicitly created in the statute."). *See also **Winston v. Reorganized Sch. Dist. R-2, Lawrence Cnty.***, 636 S.W.2d 324, 328 (Mo. banc 1982) ("[W]e are mindful of the oft repeated principle that, within constitutional limits, a sovereign may prescribe the terms and conditions under which it may be sued, and the decision to waive immunity, and to what extent it is waived, lies within the legislature's purview."). The parties have not cited a Missouri statute that waives sovereign immunity for prospective equitable relief. The five cases they cite, *Wyman/NAACP,* or other states' decisions cannot serve as a substitute.

True, *Bellefontaine* does not address the precise issue here. But it says that sovereign immunity "is the rule—not the exception—even in the absence of prior cases specifically addressing this issue." ***Bellefontaine***, 476 S.W.3d at 922. "When there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the [same issue] before us." ***Blankenship v. USA Truck, Inc.***, 601 F.3d 852, 856 (8th Cir. 2010) (alteration in original) (citation omitted). *See also **Craven v. University of Colo. Hosp. Auth.***, 260 F.3d 1218, 1231 (10th Cir. 2001) (applying the same rule to a sovereign immunity issue). This court predicts that the Missouri Supreme Court would apply *Bellefontaine*'s long-established principles to cases involving prospective equitable relief. Missouri does not have a waiver of sovereign immunity for prospective equitable relief "stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." ***Feeney***, 495 U.S. at 305.

B.

Plaintiffs also assert a recognized common law exception to sovereign immunity. *See **Bellefontaine***, 476 S.W.3d at 921-22 (stating sovereign immunity applies to all suits, in the absence of a recognized common law exception). The *Bellefontaine* case notes two such exceptions, consent and "proprietary function" (of municipalities). ***Id.*** Neither of these apply here.

Citing Blackstone, law review articles, a common-law case, and other state courts, the plaintiffs argue that "even at common law, courts of equity enforced the Crown's obligations." *See generally **Armstrong v. Exceptional Child Ctr., Inc.***, 135 S. Ct. 1378, 1384 (2015) ("It is true enough that we have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. . . . The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.") (emphasis added), *citing **Young***, 209 U.S. at 150-51 (other citations omitted).

The State counters, with arguments based on the "law or equity" phrase in the Eleventh Amendment and the Supreme Court's words in an Eleventh Amendment case that

> sovereign immunity applies *regardless* of whether a private plaintiff's suit is for monetary damages *or some other type of relief. See* [*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996)] ("[W]e have often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment").

***Fed. Mar. Comm'n***, 535 U.S. at 765-66 (emphasis added).

These expertly briefed arguments are beside the point. The Missouri Supreme Court is the "custodian" of the common law in Missouri. ***Townsend v. Townsend***, 708 S.W.2d 646, 649-50 (Mo. banc 1986). That Court has rejected that "the state itself can be enjoined." ***Carson***, 223 S.W. at 571, *following **Merchants' Exchange***, 111 S.W. at 574. A recognized common law exception to Missouri's sovereign immunity does not apply here.

III.

The plaintiffs argue that even if sovereign immunity bars prospective injunctive relief, the State "can be sued directly for equitable relief for failing to comply with a federal constitutional obligation, here, the Sixth Amendment." They stress *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304 (1987), and *Reich v. Collins*, 513 U.S. 106 (1994).

In *First English*, the Supreme Court stated it "has frequently repeated the view that, in the event of a taking, the compensation remedy is required by the Constitution." *First English*, 482 U.S. at 316. It footnoted:

> The Solicitor General urges that the prohibitory nature of the Fifth Amendment, combined with principles of sovereign immunity, establishes that the Amendment itself is only a limitation on the power of the Government to act, not a remedial provision. The cases cited in the text, we think, refute the argument of the United States that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government."

*Id.* at 316 n.9 (citations omitted). In *Reich*, the Court explained that "a long line of cases" establishes that "due process requires a 'clear and certain' remedy for taxes collected in violation of federal law," and that "a denial by a state court of a recovery of taxes exacted in violation of the laws or Constitution of the United States by compulsion is itself in contravention of the Fourteenth Amendment, the sovereign immunity States traditionally enjoy in their own courts notwithstanding." *Reich*, 513 U.S. at 108, 109-110 (citations and internal quotation marks omitted).

According to the plaintiffs, these cases (particularly the footnote in *First English*) mean that "where the Constitution places an affirmative obligation on the

-11-

State itself, the State cannot rely on state sovereign immunity to defeat a suit that aims to force it to comply with that obligation." But that is too broad a reading. Instead, the cases mean that "where the Constitution requires a *particular remedy*, such as through the Due Process Clause for the tax monies at issue in *Reich*, or through the Takings Clause as indicated in *First English*, the state is required to provide that remedy in its own courts, notwithstanding sovereign immunity." **DLX, Inc. v. Kentucky**, 381 F.3d 511, 528 (6th Cir. 2004) (emphasis added). For the situation at issue here, the Constitution does not require a "particular" or "clear and certain" remedy.

Congress may also abrogate state sovereign immunity by providing an enforcement mechanism for constitutional violations:

> We have held also that in adopting the Fourteenth Amendment, the people required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution, so that Congress may authorize private suits against nonconsenting States pursuant to its § 5 enforcement power. By imposing explicit limits on the powers of the States and granting Congress the power to enforce them, the Amendment fundamentally altered the balance of state and federal power struck by the Constitution. When Congress enacts appropriate legislation to enforce this Amendment, federal interests are paramount, and Congress may assert an authority over the States which would be otherwise unauthorized by the Constitution.

*Alden*, 527 U.S. at 756 (internal citations and quotation marks omitted). *See also United States v. Georgia*, 546 U.S. 151, 159 (2006) ("insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."). No statutory enforcement mechanism exists here.

-12-

IV.

The governor asserts sovereign immunity. The plaintiffs argue that sovereign immunity does not shield the governor because he is an *Ex parte Young* defendant. "Under the *Ex Parte Young* doctrine, a private party can sue a state officer in his official capacity to enjoin a prospective action that would violate federal law." *281 Care*, 638 F.3d at 632. The doctrine "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Stewart*, 563 U.S. at 255 (internal citation omitted). *See also* *Hutchinson*, 803 F.3d at 957 ("Enforcement of unconstitutional legislation 'is simply an illegal act upon the part of [the] state official,' and the State may not immunize officials from suit for such violations of the Constitution."), *quoting* *Young*, 209 U.S. at 159.

"In determining whether this exception applies, a court conducts 'a straightforward inquiry into whether [the] complaint alleges [1] an ongoing violation of federal law and [2] seeks relief properly characterized as prospective.'" *281 Care*, 638 F.3d at 632, *quoting* *Verizon Maryland, Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (alterations added). On the first inquiry, the official must have "some connection to the enforcement of the challenged laws." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017), *citing* *Young*, 209 U.S. at 157. *See also* *281 Care*, 638 F.3d at 632. "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt to 'make the state a party.'" *Hutchinson*, 803 F.3d at 960, *quoting* *Young*, 209 U.S. at 157. "[T]hat connection does not need to be primary authority to enforce the challenged law." *281 Care*, 638 F.3d at 632. "Nor does the [state officer] need to have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law." *Id.* at 633.

Ruling that the governor is an *Ex parte Young* defendant, the district court identified three connections to the enforcement of the State's Sixth Amendment obligation to provide indigent defendants with adequate counsel.

A.

The district court noted the governor's general-enforcement authority. The Missouri Constitution says, "The supreme executive power shall be vested in a governor," and "The governor shall take care that the laws are distributed and faithfully executed, and shall be a conservator of the peace throughout the state." **Mo. Const. art. IV, §§ 1-2**. The district court also cited a Missouri statute: "When directed by the governor, the attorney general, or one of his assistants, shall aid any prosecuting or circuit attorney in the discharge of their respective duties in the trial courts and in examinations before grand juries . . . ." **§ 27.030, RSMo**.

The district court concluded that these provisions make the Missouri governor like the Georgia governor in *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988). There, indigent defendants sought injunctive relief against a governor to remedy Sixth Amendment violations. *Luckey*, 860 F.2d at 1013. The Eleventh Circuit held that Georgia's governor had "some connection" and was an "appropriate part[y] against whom prospective relief could be ordered" because:

> According to the Georgia constitution, the governor is responsible for law enforcement in that state and is charged with executing the laws faithfully. The governor further has the residual power to commence criminal prosecutions, and has the final authority to direct the Attorney General to "institute and prosecute" on behalf of the state.

*Id.* at 1016 (internal citations omitted).

-14-

The governor here argues that this court's *Calzone* decision trumps *Luckey*. The *Calzone* plaintiff sought an injunction against the Missouri governor in a challenge to the constitutionality of a state statute. *Calzone*, 866 F.3d at 869. This court held that neither the statute nor the Missouri Constitution's general-enforcement provision make the governor an *Ex parte Young* defendant:

> No provision in Chapter 304 or the statutes defining his executive authority specifically authorizes the governor to enforce the vehicle inspection statutes. *See* Mo. Rev. Stat. § 26.010-.225. The Missouri Constitution confers upon the governor the duty to "take care that the laws are distributed and faithfully executed," Mo. Const. art. IV, § 2, but such a general executive responsibility is an insufficient connection to the enforcement of a statute to avoid the Eleventh Amendment. *See Fitts v. McGhee*, 172 U.S. 516, 530 (1899).

*Id.* at 870.

The plaintiffs try to distinguish *Calzone* because the statute there "delegated enforcement exclusively to the superintendent of the highway patrol," meaning "[t]he Governor was not a proper defendant because he has *no* connection to the statute. . . . Unlike the statute in *Calzone*, the State's constitutional obligation to provide adequate counsel—and the Governor's role in its failure to do so—cannot be delegated exclusively to the MSPD."

Although *Calzone* is factually distinguishable, its guidance on the Missouri governor's general-enforcement authority is consistent with this court's precedent. *See Hutchinson*, 803 F.3d at 961; *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), *abrogated on other grounds by Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

In *Bruning*, the Nebraska governor and attorney general were *Ex parte Young* defendants in a suit to enjoin enforcement of a state constitutional amendment.

-15-

*Bruning*, 455 F.3d at 864. This court found a sufficient connection to the enforcement of the amendment because "the Governor and the Attorney General have broad powers to enforce the State's Constitution and statutes." *Id.* The *Hutchinson* decision clarifies that statement from *Bruning*:

> [T]he court's statement [in *Bruning*] must be read in context. In *Bruning*, the "broad powers" of the officials included authority to enforce the constitutional amendment at issue. The Nebraska attorney general has power to enforce the Nebraska Constitution by bringing suit for a declaratory judgment that a state statute is unconstitutional, or for an injunction prohibiting the enforcement of a state statute on the grounds that it is unconstitutional. The Nebraska governor has some connection to the enforcement of the Nebraska Constitution because he may direct the attorney general to file suit to enjoin application of an unconstitutional state statute. That sort of enforcement authority is lacking with respect to [the] statute [at issue in *Hutchinson*] that provides only for private civil enforcement.

*Hutchinson*, 803 F.3d at 961 (internal citations omitted).

The *Bruning* and *Hutchinson* decisions mean that a governor's general-enforcement authority is "some connection" if that authority gives the governor *methods* of enforcement. The governor in *Bruning* had a method of enforcement because he could direct the attorney general to seek equitable relief. But the governors in *Calzone* and *Hutchinson* did not have a comparable enforcement mechanism.

Nor does the governor here. The district court's reliance on section 27.030 is insufficient because that provision covers aiding prosecution, not defense. The governor's general-enforcement authority is not "some connection" to enforcement of the State's Sixth Amendment obligation. *See* *Calzone*, 866 F.3d at 870. *See also* *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507,

-16-

517 (5th Cir. 2017) ("[A] state governor with a broad duty to uphold state law is not a proper defendant."); *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) ("[A] generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."); *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979) ("The mere fact that a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute.").

B.

The district court ruled the governor had "some connection" because he "appoints all seven members of the MSPD Commission." *Church*, 268 F. Supp. 3d at 1013, *citing* **§ 600.015.1, RSMo** ("The commission shall be composed of seven members . . . appointed by the governor with the advice and consent of the senate."). The district court cited the Ninth Circuit's decision in *Eu*, where a bar association sued a governor to challenge a state statute that limited the number of judges in a county. *Eu*, 979 F.2d at 699. The governor had "a duty to appoint judges to any newly-created judicial positions," which the Ninth Circuit considered to be "a specific connection to the challenged statute," placing the governor within *Ex parte Young*'s scope. *Id.* at 704.

Invoking *Eu*, the plaintiffs argue: "although the Governor alone cannot solve the indigent defense crisis in this state, his role in the ongoing violation of those Sixth Amendment rights through his appointment of MSPD Commissioners, in addition to his ability to profoundly affect MSPD caseload, is sufficient for *Ex parte Young* purposes." The governor counters with this court's decision in *Balogh v. Lombardi*, 816 F.3d 536 (8th Cir. 2016).

-17-

In *Balogh*, a Missouri statute gave a private right of action against anyone who, without the approval of the Director of Corrections, knowingly discloses the identity of an execution-team member. *Balogh*, 816 F.3d at 539. The statute also gave the director authority to select those members. *Id.* This court ruled that the director's selection authority is only "administrative or ministerial," and not "some connection" to the statute's enforcement:

> Although the director's authority to delineate the members of the execution team does affect who might have a private right of action against [someone disclosing the identity of execution team members], it has nothing to do with an execution team member's potential prosecution of such an action. Selection of the execution team constitutes implementation of the statute in an administrative or ministerial sense and is not analogous to enforcing the statute's non-disclosure provision through a civil or criminal prosecution. The director's authority to define the members of the execution team is not an enforcement action within the meaning of *Ex Parte Young* and its progeny.

*Id.* at 546.

Like in *Balogh*, appointing members of the MSPD Commission is an administrative act. *See State ex rel. Sikes v. Williams*, 121 S.W. 64, 65 (Mo. banc 1909) ("The confirmations by the Senate of appointments made by the Governor are not legislative acts . . . . Such acts by the Governor concerning appointments are merely administrative . . . ."). It does not give the governor some connection to the State's Sixth Amendment obligation. The *Balogh* decision, not *Eu*, binds this court.

C.

The district court concluded the governor met the "some connection" requirement because of his appropriation-reduction authority:

-18-

Governor Greitens's predecessor, Governor Nixon, affirmatively used his executive authority to withhold roughly $7 million in funding allocated by the Missouri Legislature to the MSPD, thereby demonstrating an even more direct "connection" to the challenged conduct. Governor Greitens has since upheld Governor Nixon's withholding of funds allocated to the MSPD.

*Church*, 268 F. Supp. 3d at 1012-13 (internal citation omitted). In addition to arguing that his appropriation-reduction authority is not "some connection", the governor asserts legislative immunity.

"[S]tate legislators enjoy common-law immunity from liability for their legislative acts." *Supreme Court of Va. v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 732 (1980). "[O]fficials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Bogan v. Scott–Harris*, 523 U.S. 44, 55 (1998). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* at 54. The act must be legislative "in substance," bearing "all the hallmarks of traditional legislation," and "in form," involving "integral steps in the legislative process." *Id.* at 55.

The district court suggested that the governor's "withholding of funds is a legislative function entitled to legislative immunity." *Church*, 268 F. Supp. 3d at 1020. It emphasized *Abbey v. Rowland*, 359 F. Supp. 2d 94, 100 (D. Conn. 2005):

Nothing could be more integral to the legislative process than [proposing a budget]. The Governor's choices of exactly how to cut the budget may have been discretionary, but they were policy choices of broad import. The fact that any budget reduction would necessarily have an adverse impact on some employment does not change the budgetary decision from a legislative to an administrative function.

-19-

Indeed, the Supreme Court has said that a "discretionary, policymaking decision implicating the budgetary priorities of the [government] and the services the [government] provides to its constituents" is a "hallmark[] of traditional legislation." **Bogan**, 523 U.S. at 55-56. And in Missouri, "the budget process . . . begins and ends with the Governor," making the governor's appropriation reduction legislative in form. *See* **Missouri Health Care Ass'n v. Holden**, 89 S.W.3d 504, 508 (Mo. banc 2002). The Missouri Constitution "does not permit the state to spend money it does not have" and "broadly authorizes the Governor to balance the state's budget in the event that state revenues fall below the revenue expectations." **Id.** at 506-07, *citing* **Mo. Const. art. IV, § 27**. A Missouri governor's appropriation reduction is a legislative act.

The district court, however, ruled that it was premature to apply legislative immunity "because it is unclear what the terms of any injunction entered would include. . . . That finding is subject to change should the Plaintiffs request any remedies that would violate Gov. Greitens' immunity from acts 'integral' to the legislative process." **Church**, 268 F. Supp. 3d at 1020. By that rationale, the remedy—not the challenged act—guides whether legislative immunity applies.

The governor counters: "legislative immunity is an *immunity from suit*, not merely an immunity from the award of certain types of relief. The district court's rationale would enable *any* plaintiff to defeat legislative immunity merely by making a vague and indefinite request for 'injunctive and declaratory relief.'"

The Supreme Court's decision in *Consumers Union* addresses this issue. There, the Supreme Court of Virginia, in addition to its inherent authority, used its statutory authority to promulgate a professional ethics code. **Consumers Union**, 446 U.S. at 721. The Virginia legislature "vested in the court virtually its entire legislative or regulatory power over the legal profession." **Id.** at 722. The court also had the power to enforce its professional ethics code. **Id.** at 722-24.

-20-

The plaintiffs believed that the code's provision on attorney advertisement violated the First Amendment. *Id.* at 726. They sued the Virginia Court and its chief justice in his personal and official capacity under 42 U.S.C. § 1983, seeking a declaration that the provision was unconstitutional and an injunction against its enforcement. *Id.* at 725-26. The chief justice and the court asserted legislative immunity. *Id.* at 730. The Supreme Court concluded (1) the Virginia court's promulgation of the professional ethics code was a legislative act, (2) "the Virginia Court and its members are immune from suit when acting in their legislative capacity," and (3) legislative immunity applies to suits for equitable relief. *Id.* at 731-32, 734.

The Supreme Court, however, did not apply legislative immunity: "If the *sole basis* for appellees' § 1983 action against the Virginia Court and its chief justice were the issuance of, or failure to amend, the challenged rules, legislative immunity *would foreclose suit* against appellants." *Id.* at 734 (emphasis added). But the Court concluded that the Virginia court's enforcement authority was a non-legislative act: "the Virginia Court performs more than a legislative role with respect to the State Bar Code. It also hears appeals from lower court decisions in disciplinary cases, a traditional adjudicative task; and in addition, it has independent enforcement authority of its own." *Id.* "For this reason the Virginia Court and its members were proper defendants in a suit for declaratory and injunctive relief." *Id.* at 736.

Under *Consumers Union*, the "basis" for suit governs whether legislative immunity "foreclose[s] suit." The Second Circuit, however, has a different interpretation of *Consumers Union*: legislators "must still show, before they are afforded the protections of legislative immunity as to claims for injunctive relief, that the requested relief would enjoin them in their legislative capacities." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 93 (2d Cir. 2007). According to the Second Circuit, the *Consumers Union* decision

applied legislative immunity to bar plaintiff's claims for injunctive relief insofar as the relief sought would compel the defendants to perform a legislative act—the repeal or amendment of the state's bar code to conform with constitutional requirements. The Court concluded, however, that legislative immunity did not bar claims for injunctive relief that would enjoin the defendant justices from committing a distinctly non-legislative act—independent enforcement of the unconstitutional provisions of the bar code against particular individuals.

*Id.* at 88, *citing Consumers Union*, 446 U.S. at 733-36. The Second Circuit assumed that the *Consumers Union* plaintiffs sought "declaratory and injunctive relief that would have forced the Supreme Court [of Virginia] to amend or repeal the code." *Id.* at 83-84. Through that assumption, the Second Circuit appears to interpret *Consumers Union*'s enforcement discussion to mean that if the suit sought only amendment or repeal, then that suit would have been barred by legislative immunity. *Id.* By the Second Circuit's reading of the case, the suit also sought an injunction against enforcement, meaning legislative immunity was not a bar in *Consumers Union*.

But *Consumers Union* does not say that the plaintiffs there sought to amend or repeal the code. The Court's only reference to amendment or repeal was as a "basis" for suit—the Virginia court's "issuance of, or failure to amend, the challenged rules." *Consumers Union*, 446 U.S. at 734. True, the *Consumers Union* plaintiffs did seek an injunction against enforcement. But the Virginia's court's enforcement of the professional ethics code also was a basis for suit: "[M]ere enforcement authority does not create a case or controversy with the enforcement official; but in the circumstances of this case, a sufficiently concrete dispute is as well made out against the Virginia Court as an enforcer . . . ." *Id.* at 736 n.15. In other words, the Virginia court's enforcement—in addition to its promulgation—of the professional ethics code was a non-legislative act that violated the First Amendment, providing a *separate* basis for suit not barred by legislative immunity. *See Alia v. Michigan Supreme Court*, 906

F.2d 1100, 1107 (6th Cir. 1990) (Wellford, J., dissenting) (analyzing *Consumers Union* and concluding "to the extent the individual justices <u>acted</u> in a *rulemaking* capacity, they are entitled to legislative immunity, but to the extent they <u>acted</u> in an enforcement capacity, they are not entitled to claim legislative immunity") (underlines added).

In the end, these ambiguities do not impact the result here. In *Consumers Union*, the Supreme Court states: "If the *sole basis* for appellees' § 1983 action against the Virginia Court and its chief justice were the issuance of, or failure to amend, the challenged rules, legislative immunity *would foreclose suit* against appellants." ***Consumers Union***, 446 U.S. at 734 (emphasis added). In the complaint here, the plaintiffs allege:

> As chief executive of the State, Governor Greitens bears ultimate responsibility for the provision of constitutionally mandated services, including indigent defense, to the people of Missouri. The Governor of Missouri appoints the members of the Missouri State Public Defender Commission, with the advice and consent of the Senate. The Governor has claimed the authority to withhold money budgeted to the Missouri State Public Defender's Office and has exercised that claimed authority in recent years, including fiscal year 2017.

As discussed above, to the extent the plaintiffs claim that the governor's general-enforcement authority and appointment authority are non-legislative acts that lead to a constitutional violation, the governor is subject to sovereign immunity for those acts because they do not satisfy *Ex parte Young*.

That leaves as "the sole basis" for the plaintiffs' action against the governor his appropriation reduction—a legislative act—meaning legislative immunity "foreclose[s] suit" against him. *See **id.*** at 734. The Supreme Court used the word "suit," not "remedy." This approach is consistent with how the Supreme Court treats sovereign immunity: "Sovereign immunity does not merely constitute a defense to

monetary liability or even to all types of liability. Rather, it provides an immunity *from suit*." **Fed. Mar. Comm'n**, 535 U.S. at 766 (emphasis added).

Even if the governor's appropriation-reduction authority is not shielded by sovereign immunity through *Ex parte Young*, legislative immunity, a separate defense, forecloses suit against the governor. *See* **Consumers Union**, 446 U.S. at 734. *See also* **Tolman v. Finneran**, 171 F. Supp. 2d 31, 37-38 (D. Mass. 2001) ("Short of the exceptional case, it is unlikely that *Ex Parte Young* is broad enough to abrogate legislative immunity and authorize suit against a legislator acting in a purely legislative capacity.").[3]

\* \* \* \* \* \* \*

---

[3]The plaintiffs argue that legislative immunity is a personal defense that does not apply to official-capacity suits, like the one here. They cite *Roach v. Stouffer*, 560 F.3d 860 (8th Cir. 2009), quoting a Second Circuit decision: "immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities; the immunities officials enjoy when sued personally do not extend to instances where they are sued in their official capacities." **Roach**, 560 F.3d at 870, *quoting* **Almonte v. City of Long Beach**, 478 F.3d 100, 106 (2d Cir. 2007). But under *Consumers Union*, legislative immunity applies to official-capacity suits. **Consumers Union**, 446 U.S. at 725-26, 734. *See also* **Scott v. Taylor**, 405 F.3d 1251, 1254 n.4, 1255 (11th Cir. 2005) (analyzing *Consumers Union* and *Kentucky v. Graham*, 473 U.S. 159 (1985), and "hold[ing] that the legislator defendants in the instant official capacity suit for prospective relief are entitled to absolute immunity."). The Second Circuit–recognizing the tension between *Almonte* and *Consumers Union*–limited *Almonte* to "claims against local-level officials, rather than state officials." **Rowland**, 494 F.3d at 86, 88 ("claims for injunctive relief against defendant state officials, sued in their official capacities, may be barred by the doctrine of legislative immunity"). To the extent *Roach* conflicts with *Consumers Union*, this court is bound by *Consumers Union*.

-24-

The judgment is reversed, and the case remanded for proceedings consistent with this opinion.[4]

_____

---

[4]This court grants the plaintiffs' motion for leave to file a sur-reply. In reaching this decision, this court considered the sur-reply attached to the motion.